**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KFC Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 18 C 5294 |
| | ) | |
| IRON HORSE OF METAIRIE ROAD, | ) | Judge John J. Tharp, Jr. |
| LLC and IRON ROOSTER, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |
| | ) | |
| PROFESSIONAL SERVICE | ) | |
| INDUSTRIES, INC., | ) | |
| | ) | |
| Third-Party Defendant. | ) | |
| | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Iron Horse of Metairie Road, LLC and Iron Rooster, LLC (together "Iron Rooster") bring a Second Amended Complaint against third-party defendant, Professional Service Industries, Inc. ("PSI"), alleging various breach of contract and tort claims related to the environmental remediation of 702 Metairie Road in Metairie, Louisiana. PSI has moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) and for partial summary judgment under Rule 56(a). PSI has also moved to strike, pursuant to Rule 56(c)(4), an exhibit submitted by Iron Rooster. For the reasons set forth below, PSI's motion to dismiss is denied, its motion to strike is denied in large part and granted in part, and its partial motion for summary judgment is granted in part and denied in part.

**BACKGROUND**

The Court addresses PSI's motion to dismiss before turning to the motion to strike and the motion for summary judgment. In considering the motion to dismiss, the Court accepts the well pleaded facts in Iron Rooster's first amended complaint as true and draws all permissible

inferences in favor of the plaintiff. *Agnew v. NCAA*, 683 F.3d 328, 334 (7th Cir. 2012).

Before KFC Corporation ("KFC") sold fried chicken at 702 Metairie Road, the property was home to a dry-cleaning business. Sec. Am. Compl. ¶ 2, ECF No. 194. This piece of history matters because, as it happens, cleaning clothes involved dirtying the soil. It remains unclear who unearthed the fact of contamination, but in the early 2000s KFC hired PSI, an environmental consulting firm, to investigate the extent of the pollution and facilitate remediation. *Id.* ¶ 14. To do so, PSI worked alongside the Louisiana Department of Environmental Quality (LDEQ), and in 2005, LDEQ accepted a Voluntary Remedial Action Plan (the "2005 VRAP") that PSI submitted on behalf of KFC. *Id*. ¶ 15. The plan called for "in-situ chemical oxidation" and "multi-phase extraction" as the primary methods of remediation. *Id*. ¶ 11.

Roughly eight years later, in September 2013, KFC and Iron Rooster entered into a purchase agreement by which Iron Rooster would buy the property. *Id.* ¶ 10. The purchase agreement provided for a due diligence period so that Iron Rooster could, among other things, investigate the environmental condition of the property. *Id.* ¶ 12. KFC directed Iron Rooster to obtain information about the status of remediation from KFC's Environmental Programs Manager, Julie Reese. *Id.* ¶ 18. Reese, however, didn't provide the desired information and prevented Iron Rooster from discussing the remediation of the property with other KFC employees. *Id.* ¶ 19. Instead, Reese directed Iron Rooster to communicate with PSI, which was still under contract with KFC at the time (the KFC-PSI contract). *Id.* Despite KFC's instruction to treat Iron Rooster like a client, *Id.* ¶ 20, PSI painted an unduly rosy picture of the status of remediation. PSI did not disclose that the multiphase extraction system—one of the two primary components of the 2005 VRAP— had become inoperable in 2012. *Id.* ¶ 28. PSI also failed to disclose that it had never "fully delineated the containment plume" that was to be addressed in the 2005 VRAP or "definitively

determined the direction of groundwater flow" at the site. *Id.* ¶ 26. PSI also omitted that it had met with LDEQ in October 2013 to discuss the stalled remediation on the property. *Id.* ¶ 22. To the contrary, PSI assured Iron Rooster that remediation was "virtually complete." *Id.* ¶ 30. PSI claimed that "LDEQ would approve a new VRAP under which the sole remaining remediation would consist of the installation of a cap on a portion of the Property"—a project that, as of January 2014, PSI represented would cost $8,000-$10,000. *Id.* ¶¶ 32-33. To substantiate these projections, PSI provided Iron Rooster a proposal for the new VRAP (the "2014 VRAP proposal") on February 13, 2014—the day before the scheduled sale. *Id.* ¶ 35. Relying on PSI's representations, Iron Rooster agreed to purchase the property and the sale closed on February 14, 2014. *Id.* ¶ 40. As part of the sale, Iron Rooster and KFC signed an Assignment, Assumption and Indemnity Agreement, under which KFC assigned to Iron Rooster all of KFC's rights under the 2005 VRAP and KFC's contract with PSI. *Id.* ¶ 43.

Even after the sale and the assignment of the KFC-PSI contract, however, PSI failed to tell Iron Rooster about the defunct extraction system, the un-delineated containment plume, and the lack of clarity around the flow of water underneath the site. *Id.* ¶ 46. Still unaware of these problems, Iron Rooster engaged PSI to implement the 2014 VRAP proposal and obtain a certificate of completion from LDEQ—a relationship that Iron Rooster characterizes as being "[p]ursuant to the PSI contract, and pursuant to written and oral agreements to extend, modify and/or amend the PSI contract." *Id.* ¶ 45. The first step, according to PSI, was to conduct further confirmatory sampling to verify the likelihood of success of the solution contemplated by the 2014 VRAP proposal—a concrete cap on the portion of the property that still had excess levels of contaminants. *Id.* ¶ 49. Accordingly, on March 14, 2014, PSI presented Iron Rooster with a proposal to provide this soil sampling, which Iron Rooster authorized (the "March 2014 post-sale agreement"). *Id.*

¶ 51. A few months later, on June 14, 2014, PSI provided a second proposal, which Iron Rooster also authorized (the "June 2014 post-sale agreement"). *Id.* ¶ 54.[1] In the second proposal, PSI committed to prepare and obtain a new VRAP in line with the 2014 VRAP proposal and satisfy the remediation requirements for "obtaining a Certification of Completion under Partial VRP." *Id.* ¶ 55. Roughly nine months later, in March 2015, PSI submitted a new VRAP application. *Id.* ¶ 59. LDEQ informed PSI, however, that it could not accept the March 2015 application because KFC's 2005 VRAP remained in place. *Id.* ¶ 50. PSI assured Iron Rooster that it would obtain KFC's cooperation in submitting the March 2015 VRAP. *Id.* ¶ 62. PSI presented the VRAP application to KFC and requested that KFC withdraw its 2005 VRAP, but KFC refused to withdraw the prior VRAP, instead requesting to be a co-applicant on the new application. *Id.* ¶¶ 63-64. PSI revised and resubmitted the VRAP application with KFC's name attached, but the new application ran into the same problem: even as a co-applicant, KFC refused to withdraw the 2005 VRAP. *Id.* ¶¶ 65-66. Although the record is not clear as to why KFC took this position, Iron Rooster attributes the refusal to the fact that the new VRAP application did not provide for remediation of an adjacent parcel. *Id.* ¶ 67.

In response to these difficulties, PSI sent Iron Rooster a third proposal in May 2015, which provided for further sampling—this time including the adjoining property. *Id.* ¶ 71. PSI represented that the off-site sampling was necessary to address LDEQ's concerns. *Id.* ¶ 74. On June 29, 2015, PSI submitted a revised version of the third proposal, which Iron Rooster authorized (the "June 2015 post-sale agreement"). *Id.* ¶¶ 72-73. And as late as May 2016, PSI submitted offsite sampling results to LDEQ pursuant to this agreement. *Id.* ¶ 77.

---

[1] Per the materials and briefing on the motion for summary judgment, the parties are now in agreement that the June 2014 proposal was modified and superseded by an August 2014 proposal, which Iron Rooster authorized (the "August 2014 post-sale agreement").

Soon thereafter, however, the relationship between PSI and Iron Rooster soured. On June 6, LDEQ issued a notice to KFC that LDEQ would require additional offsite investigation and testing under the 2005 VRAP, and that, as sole applicant for the 2005 VRAP, KFC would be responsible for the additional testing. *Id*. ¶¶ 78, 82. KFC engaged its previous partner PSI to perform this investigation and, in June 2016, PSI—without prior warning or written notice—ceased all work for Iron Rooster. *Id*. ¶¶ 79, 84. Then, in October 2016, PSI ceased communications with Iron Rooster, a development that Iron Rooster attributes to a request of KFC. *Id*. ¶ 89. Nonetheless, roughly a year later PSI undertook further sampling and analysis to determine the extent of contamination on the property and the neighboring property. *Id*. ¶ 96. Following the analysis, PSI did not provide timely results from those samples to Iron Rooster and still has not produced all the requested results. *Id*. ¶ 97. Despite the lack of communication, on January 30, 2018, PSI submitted an invoice to Iron Rooster for $25,881.20 to cover the most recent sampling. *Id*. ¶ 98.

In December 2016, KFC filed suit against Iron Rooster in the Eastern District of Louisiana alleging breach of contract under the February 2014 purchase and assignment agreements for failure to complete the remediation required by the 2005 VRAP. Iron Rooster filed a third-party complaint against PSI, asserting breach of contract,[2] detrimental reliance, negligent and fraudulent misrepresentations and omissions, and a claim for attorney's fees, costs, and expenses. PSI moved to have the complaint transferred to this Court in accordance with the forum selection clause (PSI is based in Chicago) contained in the post-sale agreements. On June 30, 2018, Judge Vance granted PSI's motion and transferred the third-party complaint to this Court pursuant to 28 U.S.C.

---

[2] Count I is for "Breach of Contract"; Count II is for "Specific Performance," which is a remedy for breach of contract, not a distinct legal basis of liability.

§ 1404(a), which permits a court to transfer a case to any venue to which "all parties have consented." *See also Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 59 (2013) ("Section 1404(a) therefore provides a mechanism for enforcement of forum-selection clauses that point to a particular federal district."). The litigation between KFC and Iron Rooster has since settled.

## DISCUSSION[3]

### I. PSI's Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible if the plaintiff has pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A plaintiff does not need "detailed factual allegations," but must plead more than "labels and conclusions" and "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Determining whether a complaint plausibly states a claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Although PSI's motion to dismiss seeks the dismissal of Iron Rooster's entire complaint, in its briefs PSI sets forth arguments targeting only four of the eight putative bases of liability set forth in the complaint. First, PSI argues that Iron Rooster has failed to state a claim for detrimental

---

[3] Neither party addresses the choice of law issue and, as a result, the Court applies Illinois law. *See McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014) ("When no party raises the choice of law issue, the federal court may simply apply the forum state's substantive law.").

reliance. Second, PSI maintains that Iron Rooster's indemnification claim must fail because it is inconsistent with the claim for breach of contract. Third, PSI contends that Iron Rooster failed to plead the negligent misrepresentation claim with sufficient detail. Finally, PSI seeks the dismissal of Iron Rooster's request for attorneys' fees. PSI offers no argument for dismissal of any claims for relief based on breach of contract or fraud theories.[4] Accordingly, there is no basis to dismiss the complaint to the extent that it asserts a legal claim based on the facts on which liability on those theories would be based.

Arguably, that means denial of PSI's entire motion to dismiss, as the facts set forth in the complaint may reasonably be understood to set forth a single legal claim for relief premised upon a variety of legal theories. A "claim is the aggregate of operative facts which give rise to a right enforceable in the courts. One claim supported by multiple theories does not somehow become multiple claims." *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 399 (7th Cir. 2012) (internal citations omitted); *see also NAACP v. Am. Family Mut. Ins. Co.,* 978 F.2d 287, 292 (7th Cir. 1992) ("No matter how many legal theories, or 'counts,' a plaintiff may assert, they constitute a single 'claim' to the extent premised on the same facts; different legal theories . . . do not multiply the number of claims for relief.").

The basic claim asserted in the complaint is that PSI made statements—whether properly characterized as promises, assurances, or representations of fact— concerning the remediation of the Metairie Road property that were either untrue when made or on which PSI never delivered. Based on that single set of operative facts, Iron Rooster has asserted that PSI is liable to it under theories of breach of contract, quasi-contract, fraud, negligence, and indemnity. And in seeking

---

[4] PSI does seek summary judgment on Iron Rooster's fraud claims; those arguments are considered in the context of that motion. See *infra* at 19-23.

the dismissal of only some of those legal theories, PSI has not provided a basis to dismiss Iron Rooster's claim for relief; rather, it has raised arguments only against several theories upon which liability on that claim might be based. But Rule 12(b)(6) does not authorize the dismissal of legal theories. "A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015).[5] Indeed, it is axiomatic that a plaintiff is not required to plead legal theories at all. *See Jajeh v. County of Cook*, 678 F.3d 560, 567 (7th Cir.2012) (hostile work environment claim pleaded where complaint never used that term). Accordingly, no penalty attaches to the assertion in the complaint of legal theories that fail as a matter of law. *See, e.g., Rabe v. United Airlines, Inc.,* 636 F.3d 866, 872 (7th Cir. 2011) ("A complaint need not identify legal theories, and specifying an incorrect theory is not a fatal error."). As long as the plaintiff can, in response to a motion to dismiss, identify some plausible theory that would entitle it to relief on its claim, that claim may move forward and a motion to dismiss other legal theories must be denied.

Even if the Iron Rooster complaint is construed to set forth multiple claims, PSI's motion to dismiss would still fail. To start, PSI articulates two arguments against a detrimental reliance claim, but neither has merit. To prove a claim based on detrimental reliance—or, as it is more commonly known, promissory estoppel—a plaintiff must show that (1) the defendant made an unambiguous promise to the plaintiff; (2) plaintiff relied on such a promise; (3) plaintiff's reliance

---

[5] "Summary judgment is different. The Federal Rules of Civil Procedure explicitly allow for '[p]artial [s]ummary [j]udgment' and require parties to 'identif[y] each claim or defense—***or the part of each claim or defense***—on which summary judgment is sought.' Fed. R. Civ. P. 56(a) (emphasis added). At the summary-judgment stage, the court can properly narrow the individual factual issues for trial by identifying the material disputes of fact that continue to exist." *City of Angola*, 809 F.3d at 325.

was expected and foreseeable by defendant; and (4) plaintiff relied on the promise to its detriment. *Quake Const., Inc. v. Am. Airlines, Inc.*, 141 Ill. 2d 281, 309-10, 565 N.E.2d 990, 1004 (Ill. 1990). First, PSI contends that Iron Rooster alleges only a single act of reliance—the purchase of the property—and that prior to the sale, PSI made only representations, not promises. PSI may be correct that PSI's pre-sale behavior did not amount to promising anything, but the Court need not decide at this juncture because the argument takes too limited a view of the reliance alleged by Iron Rooster's complaint. Contrary to PSI's contention, Iron Rooster also alleges reliance that post-dates the sale of the property. For example, Iron Rooster alleges that it relied on PSI's promises to achieve the 2015 VRAP or, in the alternative, to continue working with it to successfully remediate the property through other means. Sec. Am. Compl. ¶ 81.

This is where PSI's second argument comes into play—albeit to no avail. PSI contends that this post-sale reliance cannot form the basis of a promissory estoppel claim because it overlaps with the alleged breach of contract claim. PSI is correct that, under Illinois law, promissory estoppel is available only where there is no express contract. *See Prodromos v. Poulos*, 202 Ill. App. 3d 1024, 1032, 560 N.E.2d 942, 948 (Ill. App. Ct. 1991) ("As a rule, plaintiffs cannot pursue quasi-contractual claims where there is an express contract between the parties."); *Prentice v. UDC Advisory Services, Inc.*, 271 Ill. App. 3d 505, 511, 648 N.E.2d 146, 150 (Ill. App. Ct. 1995) ("[I]f a party's performance under a written contract is the same performance which satisfies the requirement of detrimental reliance, then that party is barred from seeking redress under the doctrine of promissory estoppel."). But, as a general matter, Federal Rule of Civil Procedure 8(d)(3) permits plaintiffs to plead alternative theories of liability, and in a case like this a "plaintiff may plead breach of contract in one count and unjust enrichment and promissory estoppel in

9

others." *The Sharrow Grp. v. Zausa Dev. Corp.*, No. 04 C 6379, 2004 WL 2806193, at *3 (N.D.

Ill. Dec. 3, 2004).[6] As a result, PSI's motion to dismiss the claim is denied.

PSI's argument for dismissal of Iron Rooster's claim for indemnity fails for similar reasons.

PSI contends that, if true, the allegations set forth in the complaint absolve Iron Rooster of any

liability to KFC and are therefore inconsistent with a claim against PSI to indemnify Iron Rooster

for such liability. But there is "no rule against inconsistent pleadings in different suits, or for that

matter a single suit." *Peterson v. McGladrey & Pullen, LLP*, 676 F.3d 594, 597 (7th Cir. 2012);

*see also* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has,

---

[6] Despite affirming this pleading practice as a general matter, the court in *The Sharrow Group* held that the complaint failed to properly plead promissory estoppel on grounds this Court finds unconvincing. 2004 WL 2806193, at *3. In that case—and in the present case—the plaintiff incorporated all preceding paragraphs in the promissory estoppel count, including those that referenced an express contract. Noting this incorporation, the court reasoned that dismissal without prejudice was required because a plaintiff "may not include allegations of an express contract, which governs the relationship of the parties, in the counts for unjust enrichment and promissory estoppel." *Id.* The problem with this reasoning is that it overstates the importance of a complaint's self-described "counts" in assessing the existence of a claim. "Although it is common to draft complaints with multiple counts, each of which specifies a single statute or legal rule, nothing in the Rules of Civil Procedure requires this. To the contrary, the rules discourage it." *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992). The operative question is whether there is some legal theory that could give the plaintiff the right to recover on the facts alleged. Here, there are alleged promises that do not rely on express contracts, s*ee, e.g.,* Sec. Am. Compl. ¶ 81, and any inconsistencies between those allegations and allegations of express contracts are not fatal at this stage. *See Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*, 910 F.2d 1540, 1548 (7th Cir. 1990) ("Courts allow a pleading of the sort 'I never borrowed the lawn mower, it was broken when I borrowed it, and I returned it in perfect condition' because pleadings precede discovery and trial."). This sort of "[i]nconsistency is acceptable because, at the end of the day, only one of these positions can obtain, and the pleader is limited to a single recovery no matter how many different (and conflicting) theories it offers." *Id.* As relevant here, the validity of the alleged express contracts may still be challenged, and if that challenge is successful, the facts set out in the complaint may support—indeed, only support—a claim for promissory estoppel. Whether or not it successfully pleaded separate, internally consistent counts, Iron Rooster's complaint has successfully pleaded a claim for promissory estoppel as an alternative to breach of contract. S*ee, e.g., Jackson Nat. Life Ins. Co. v. Gofen & Glossberg, Inc.*, No. 93 C 1539, 1993 WL 266548, at *3 (N.D. Ill. July 15, 1993) (rejecting a motion to dismiss the promissory estoppel claim on this basis).

regardless of consistency."). Here, simply alleging facts that, if true, tend to undermine potential liability in another suit quite clearly does not prevent Iron Rooster from asserting an indemnification claim for that same liability.

What would prevent Iron Rooster's indemnity claim from moving forward, however, is the actual preclusion of indemnification-covered costs due to court order or settlement. And PSI raises precisely this defense in its reply brief: "KFC settled its claims against Iron Rooster" and "[c]onsequently, Iron Rooster's indemnification claims against PSI are moot and should be dismissed." Def. Reply Br. 2. ECF No. 229. But PSI's interpretations of Iron Rooster's claim for relief and the relevant indemnification clause are contestable and Iron Rooster has not had a chance to respond. "[I]t is well-established that arguments raised for the first time in the reply brief are waived." *Mendez v. Perla Dental*, 646 F.3d 420, 423-24 (7th Cir. 2011). PSI may nonetheless raise the argument in any future motion on the claim—but there is ample reason to question its viability, waiver or no.

While Iron Rooster's claim for relief references indemnification as an alternative remedy upon a "judgment" against it in the KFC suit, the indemnification clause in the PSI-Iron Rooster proposals arguably grants a broader right to recovery. *See* Reply Br. Sup. Mot. Dismiss 3, ECF No. 229 ("PSI agrees not to defend but to indemnify and hold Client [Iron Rooster] harmless from and against any and all claims, suits, costs and expenses including reasonable attorney's fees and court costs to the extent arising out of PSI's negligence as finally determined by a court of law."). PSI contends that settlement in the KFC suit precludes "negligence as finally determined by a court of law," but PSI's negligence is at issue in this case, not that case. Iron Rooster has asserted a negligent misrepresentation claim against PSI and may, as a result, incur fees and/or costs even if the claim is successful. In that case, PSI could be liable under an indemnification theory for those

11

fees and costs as arising from its negligence. *See Water Tower Realty Co. v. Fordham 25 E. Superior, L.L.C.*, 936 N.E.2d 1127 (Ill. App. Ct. 2010) ("A party wishing to narrow an indemnification clause to third-party damage is obligated to limit the scope of the clause expressly, and absent such express limitation, indemnification clauses may apply to damage suffered by the contracting parties themselves."). The Court makes no such ruling at this juncture; it is enough to say that Iron Rooster's settlement with KFC does not "moot" the possibility that PSI could be liable to Iron Rooster on an indemnification theory, in addition to a negligence theory, if Iron Rooster prevails on its negligence claim.

Indemnification might be moot if PSI's arguments warranted dismissal of the negligent misrepresentation claim (the only negligence theory Iron Rooster has identified), but they do not. As to Iron Rooster's claim for negligent misrepresentation, PSI again forwards only a single, ultimately unsuccessful argument in its initial memorandum before raising additional arguments in reply. In its memorandum, PSI sets forth the elements of negligent misrepresentation and contends that Iron Rooster has failed to plead the first—a false statement of material fact—with sufficient specificity. *See* Mem. Sup. Mot. Dismiss 8, ECF No. 203 ("Iron Rooster merely states that PSI made false representations regarding contamination and remediation, but does not establish what the alleged misrepresentations were about, who made these representations, when they were made, or where they were made."). In so doing, PSI appears to invoke the heightened pleading standard applicable to fraud claims under Federal Rule of Civil Procedure 9(b). Under Rule 9(b), a party alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake." But Rule 9(b) does not apply to claims for negligent misrepresentation. *See Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 833 (7th Cir. 2007) ("We therefore must examine the necessary elements of a negligent

misrepresentation claim under Illinois law. This claim is not governed by the heightened pleading standard of Rule 9(b)."). Assessed under the ordinary pleading standard set forth above, the alleged misrepresentations regarding the extent of remediation state a claim that is plausible on its face. Because the Court declines to consider PSI's alternative arguments raised for the first time on reply, *see Mendez*, 646 F.3d at 423-24, the motion to dismiss is denied as to the claim for negligent misrepresentation.

PSI's final argument concerns Iron Rooster's request for attorneys' fees. PSI properly notes that Iron Rooster did not respond to this argument, which normally constitutes waiver. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010). Under Illinois law, however, a request for attorneys' fees is not an independent "claim." *See Ritter v. Ritter*, 381 Ill. 549, 555, 46 N.E.2d 41, 44 (1943). Rather, an award of attorneys' fees is a remedy available to successful parties in limited circumstances. *See id.* at 552-554. As a result, a request for attorneys' fees is not subject to dismissal pursuant to Rule 12(b)(6).

In sum, PSI's motion to dismiss is denied in its entirety.

## II. PSI's Motion for Summary Judgment

PSI's partial motion for summary judgment seeks to circumscribe its potential liability in three ways. First, PSI argues that a contractual liability limitation in the post-sale agreements entitles it to judgment regarding the limit of its potential liability to Iron Rooster. Second, PSI argues that a contractual time limitation in the post-sale agreements requires dismissal of claims arising prior to February 28, 2016. Third, PSI argues that no reasonable factfinder could find it liable for fraud. PSI presented these arguments in a motion for summary judgment (rather than its motion to dismiss) because they rely on exhibits not included in Iron Rooster's complaint, among them the post-sale agreements and a declaration by a PSI employee Steve Whiting.

13

Summary judgment is appropriate only if the defendants show that there is "no genuine dispute as to any material fact and [that they are] entitled to judgment as a matter of law." *EEOC v. CVS Pharmacy, Inc.*, 809 F.3d 335, 339 (7th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the Court construes "all facts and makes all reasonable inferences in favor of the non-moving party." *Jajeh v. County of Cook*, 678 F.3d 560, 566 (7th Cir. 2012). Nonetheless, "[t]he moving party is 'entitled to a judgment as a matter of law' [when] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Before assessing PSI's motion, the Court must first address the parties' failure to comply with LR 56.1 and PSI's motion to strike to determine the extent of the record under review.

### A. Local Rule 56.1

Under the Local Rules for the Northern District of Illinois, "a party filing a motion for summary judgment . . . must serve and file 'a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law.'" *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008) (quoting LR 56.1(a)(3)). A party opposing the motion must (1) file a response to each numbered paragraph in the movant's statement of material facts including, in the case of disagreement, a specific reference to the affidavits, parts of the record, or other supporting materials relied upon and (2) file its own statement, consisting of short, numbered paragraphs, of any additional facts that would require denial of summary judgment. LR 56.1(b)(3). Iron Rooster

filed a response to PSI's statement of facts but supported its denials with cites to the record only haphazardly. Where Iron Rooster's denials fail to cite an evidentiary basis, the Court declines to credit them. *See Uncommon, LLC v. Spigen, Inc.*, 305 F. Supp. 3d 825, 838 (N.D. Ill. 2018), aff'd, 926 F.3d 409 (7th Cir. 2019).

Furthermore, Iron Rooster did not file its own statement of facts. Instead, in its Response Brief, Iron Rooster cites directly to exhibits and filings—some of which are not even filed before this Court. *See* Resp. Br. 6 n.30, ECF No. 221 (citing to "a previous affidavit given by Mr. Caldarera that was filed in this action on November 14, 2017, while the action was pending in the Eastern District of Louisiana"). Although the Court may look beyond the statement of facts and consider "other materials in the record" in assessing the motion for summary judgment, Fed. R. Civ. P. 56(c)(3), it is not obligated "to scour the record looking for factual disputes." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994). Rather, the Court is entitled to strictly enforce Local Rule 56.1 by "limit[ing] its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Rule 56.1] statements." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). This is particularly so where, as here, the Court expressly noted (during the status hearing on June 11, 2019) that the parties would have to comply with the local rules governing summary judgment motions. As a result, except where otherwise noted, the Court uses PSI's "statement of material facts in determining whether summary judgment is proper, but still view[s] those facts in the light most favorable to [Iron Rooster]." *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006).

PSI also runs afoul of Local Rule 56.1—albeit to a more limited extent. PSI filed a LR 56.1 statement of facts, but its Reply Brief repeatedly cites the deposition testimony of former PSI executive Chris Humphreys, which was not referenced in or attached to the LR 56.1 statement.

*See* Reply Br. 7, ECF No. 227; Deposition of Chris Humphreys, ECF No. 227-1. As Iron Rooster correctly contends (in a filing the Court construed as a surreply to the motion for summary judgment), the inclusion of and reliance on this evidence is barred by Local Rule 56.1 and the rules of motions practice more generally. *See Premier Capital Mgmt., LLC v. Cohen*, No. 02 C 5368, 2008 WL 4378313, at *2 (N.D. Ill. Mar. 24, 2008) (LR 56.1 "does not allow the movant to make successive filings of statements of fact to which the non-movant has no opportunity to respond."); *see also Gold v. Wolpert*, 876 F.2d 1327, 1331 n.6 (7th Cir. 1989) ("It is well-settled that new arguments cannot be made for the first time in reply. This goes for new facts too.") (internal citations omitted). As a result, the Court disregards the improperly introduced deposition testimony in assessing PSI's motion for summary judgment.

### B. PSI's Motion to Strike

PSI has moved to strike as inadmissible the affidavit of Joseph Caldarera—included as an exhibit to Iron Rooster's Response Brief. The above discussion of LR 56.1 does not render the motion moot—even if excluded as a source of facts, unless struck, the affidavit can still serve as a source of properly cited denials. *See* LR 56.1(b)(3) (permitting a party to make denials upon "specific reference to the affidavits, parts of the record, or other supporting materials relied upon."). Although motions to strike are generally disfavored, *Heller Financial, Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989*)*, given Iron Rooster's failure to file a LR 56.1 statement, PSI lacked an opportunity to contest the affidavit's contents in the normal course. *See Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*, 379 F. Supp. 2d 968, 971 (N.D. Ill. 2005) (LR 56.1 "includes its own enforcement provisions, making motions to strike LR 56.1 statements or responses superfluous at best."). PSI provides three grounds for striking the affidavit: first, that Caldarera lacks the requisite personal knowledge to attest to many of the facts included; second,

that other statements are not facts at all, but rather "legal conclusions" or "personal opinions;" and third, that documents referenced in the affidavit are not properly attached for review. As to the first, PSI is correct that statements in an affidavit must be made on personal knowledge, Fed. R. Civ. P. 56(c)(4), but Mr. Caldarera's affidavit begins by setting out the basis for his statements: he is the sole member of Iron Rooster. Each statement challenged by PSI can be reasonably traced to personal knowledge that Mr. Caldarera gained in that capacity. For example, the Court finds it sufficiently plausible—and generally implied by the affidavit—that Mr. Caldarera witnessed KFC instruct PSI to "treat Iron Rooster as its client" during contractual negotiations. Caldarera Affidavit ¶ 2, ECF No. 221-1. The same can be said for the statements in paragraphs 4, 5, 6, 10, 12, 16, 17, and 18, which PSI also challenges on the ground of personal knowledge.

PSI's second proffered ground for inadmissibility is somewhat stronger but does not justify striking the affidavit: statements, or portions of statements, included in Mr. Caldarera's affidavit do amount to impermissible legal conclusions or irrelevant personal opinions. None of the paragraphs complained of (3, 4, 7, 8, 9, 11, 13, 14, 15, 19, and 20), however, contain pure legal conclusions—instead they "meld fact with legal conclusion." *Maher v. Rowen Grp., Inc.*, No. 12 C 7169, 2015 WL 273315, at *4 (N.D. Ill. Jan. 20, 2015). Rather than strike any paragraph in its entirety, the Court chooses to "disregard all inappropriate conclusory statements . . . and consider only the admissible facts presented." *Id.*

Without specifically invoking the Federal Rules of Evidence, PSI's final argument—that certain statements attest to the content of documents, namely contractual agreements, not properly attached to the affidavit—raises a best evidence rule issue. The best evidence rule requires: "[a]n original writing, recording, or photograph . . . in order to prove its content unless these rules or a federal statute provides otherwise." Fed. R. Evid. 1002. Mr. Caldarera's affidavit clearly falls

within its scope—he does not merely reference the contractual agreements to make the broader point that the parties entered into a contract (which he could do from firsthand knowledge), he describes the contents of the agreements. *See Simmons v. Allsteel, Inc.*, No. 95 C 3049, 1999 WL 1045214, at *2 n.6 (N.D. Ill. Nov. 12, 1999) ("Thus, the relevant question is whether Cosgrove's testimony proves an event from his firsthand knowledge of the event. If so, Rule 1002 does not apply. If Cosgrove's testimony goes to the contents of the leases or seeks to prove an event from his familiarity with the leases, Rule 1002 applies.").

In response, Iron Rooster argues that PSI's attachment of the referenced contractual agreements to the motion for summary judgment rendered re-attachment to Mr. Caldarera's affidavit unnecessary. To the extent that PSI's attachments confirm Mr. Caldarera's description of the contractual language—which they do for affidavit paragraphs 16, 17, and 18—the Court agrees. As to these paragraphs, there is no genuine dispute of fact. But only to that extent. With respect to affidavit paragraph 12, the contractual agreements attached to PSI's motion for summary judgment directly refute the description of the agreements offered by Mr. Caldarera. Mr. Caldarera states that "'General Conditions' were not incorporated or even referenced in the August 21, 2014 PSI Proposal that was presented to Iron Rooster." Caldarera Affidavit ¶ 12, ECF No. 221-1. But PSI correctly points out in its Reply Brief, that, in the version of the agreements attached to the motion for summary judgment, "the eighth page of the proposal is the General Conditions at issue." Reply Br. 6, ECF No. 227; *See also* August 21, 2014 Agreement 8, ECF No. 211-10. Where, as here, Mr. Caldarera seeks to introduce an opposing version of the contract, he cannot do so through his affidavit, he must provide the original writing. Because Mr. Caldarera has not done so, the Court strikes paragraph 12 of the affidavit as inadmissible under Federal Rule of Evidence 1002.

In sum, PSI's motion to strike is granted in part and denied in part. Where denied, however,

the Court will disregard denials based on conclusory statements or irrelevant opinion testimony.

### C. Fraud

Moving on to the substantive arguments presented in PSI's partial motion for summary judgment, the Court takes up the issue of fraud first. In moving for summary judgment on the fraud claim, however, PSI does not argue that Iron Rooster failed to adduce evidence capable of supporting the allegations in its complaint—instead, PSI argues that, even taking the allegations in the complaint as true, Iron Rooster has not identified facts capable of proving the necessary elements of the claim. Although Rule 56 is most often used to force the non-movant to substantiate allegations in the complaint with evidence admissible at trial, PSI's use of the rule—challenging the sufficiency of those allegations and forcing Iron Rooster to fill any holes in the complaint with admissible evidence—is also permissible. As discussed above, Iron Rooster failed to properly introduce evidence for the purposes of this motion; as a result, the Court assesses the sufficiency of the fraud claim solely on the allegations contained within the complaint.

Under Illinois law, fraud can take two forms—fraudulent suppression or fraudulent misrepresentation—and Iron Rooster has alleged both. To prevail on a claim of fraudulent misrepresentation, a plaintiff must establish the following elements: "(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance on the truth of the statement; and (5) damage to the plaintiff resulting from such reliance." *Doe v. Dilling*, 228 Ill. 2d 324, 343, 888 N.E.2d 24, 36 (Ill. 2008). "[F]raud also may consist of the intentional omission or concealment of a material fact under circumstances creating an opportunity and duty to speak." *Janowiak v. Tiesi*, 402 Ill. App. 3d 997, 1006, 932 N.E.2d 569, 579 (Ill. App. Ct. 2010) (quoting *Thornwood, Inc. v. Jenner & Block*, 344 Ill.App.3d 15, 25, 799 N.E.2d 756, 765 (Ill. App. Ct. 2003)). PSI identifies

one insufficiency in each claim: first, PSI contends that Iron Rooster does not allege any false representations of fact made by PSI, only assurances as to future events or statements of opinion; second, PSI argues that Iron Rooster has not alleged facts establishing a duty to speak as necessary for fraudulent suppression.

Iron Rooster points to four representations by PSI as potential bases for its fraud claim: first, that "remediation of the Property was virtually complete," Sec. Am. Compl. ¶ 30; second, that PSI could prepare a new VRAP for $8,000-$10,000, *id.* ¶ 33; third, that PSI "would obtain KFC's cooperation in submitting the March 2015 VRAP and Application," *id.* ¶ 62; fourth, that PSI would continue to work with and assist Iron Rooster through the completion of remediation, *id.* ¶ 81. PSI is correct that neither assurances as to future actions nor statements of opinion provide a proper basis for a fraud claim. "[P]romissory fraud, involving a false statement of intent regarding future conduct, is generally not actionable under Illinois law unless the plaintiff also proves the act was a part of a scheme to defraud." *Ass'n Benefit Servs., Inc. v. Caremark RX, Inc. et al.*, 493 F.3d 841, 853 (7th Cir. 2007). Similarly, "[a] statement that merely expresses an opinion or that relates to future or contingent events, rather than past or present facts, does not constitute an actionable misrepresentation." *West v. W. Cas. & Sur. Co.*, 846 F.2d 387, 393 (7th Cir. 1988). And PSI is also correct that Iron Rooster has not pleaded a scheme to defraud, so any alleged promises of future conduct cannot support a fraud claim. These rules knock out the second, third, and fourth alleged statements: all describe promises of future action by PSI. It is possible to view the second representation—the projected cost of preparing a future VRAP—as descriptive, not promissory, but even then, it is best classified as an opinion as to future events. *See Lagen v. Balcor Co.*, 274 Ill. App. 3d 11, 17, 653 N.E.2d 968, 973 (Ill. App. Ct. 1995) ("Generally, financial projections are considered to be statements of opinion, not fact.").

20

That leaves the first representation—that remediation at the property was virtually complete. This statement does not promise to complete remediation or describe future events—it describes the extent of as-yet unaddressed contamination at the site. And a reasonable factfinder could conclude that it was a statement of fact, not opinion—especially when considered in the context of the case. "Whether a statement is one of fact or of opinion depends on all the facts and circumstances of a particular case." *West v. W. Cas. & Sur. Co.*, 846 F.2d 387, 393 (7th Cir. 1988). As relevant here, "Illinois courts have also emphasized that statements of opinion are treated as statements of fact when the speaker has held himself out as having special knowledge." *Id.* at 393-94. Given that PSI oversaw remediation and had expertise on the subject, a reasonable jury could find that the statement was "meant to be understood" as a fact. *See id.* at 394.

As for fraudulent suppression, Iron Rooster claims that PSI failed to disclose "the extent of the contamination, that the a [sic] multi-phase extraction method had been abandoned, and that PSI and DEQ would be meeting to discuss a new 'path forward' on October 31, 2013." Sec. Am. Compl. ¶ 130. PSI argues that the facts alleged do not establish the requisite duty to speak. Under Illinois law, a duty to speak arises only in the context of a "special or fiduciary relationship." *Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 401 (7th Cir. 2011). Fiduciary duties can obtain as a matter of law—such as in attorney-client or principal-agent relationships—or they may arise by way of circumstance. *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 500, 675 N.E.2d 584, 593 (Ill. 1996). A fiduciary-in-fact relationship is created when one party "places trust and confidence in another, thereby placing the latter party in a position of influence and superiority over the former." *Id. See also Pommier v. Peoples Bank Maycrest*, 967 F.2d 1115, 1119 (7th Cir. 1992) ("The essence of a fiduciary relationship is that one party is dominated by the other.") In assessing superiority and influence, courts consider "the degree of kinship of the parties, the

21

disparity in age, health, mental condition, education and business experience between them, and the degree of trust placed in the dominant party." *Amendola v. Bayer*, 907 F.2d 760, 764 (7th Cir. 1990). Superiority and influence may also arise where a party "represents himself to be expert as well as trustworthy and the other is not expert and accepts the offer and reposes complete trust in him." *Burdett v. Miller*, 957 F.2d 1375, 1381 (7th Cir. 1992), as amended on denial of reh'g (May 1, 1992). Arms-length business transactions, on the other hand, do not ordinarily give rise to fiduciary duties—even where one party has a "slightly dominant business position." *See Pommier*, 967 F.2d at 1119.

Iron Rooster's response offers no argument or evidence that would support a determination that PSI was acting on its behalf as a fiduciary; it essentially ignores PSI's suppression argument altogether. Even putting aside its lack of response, and viewing the facts in the light most favorable to Iron Rooster, the Court concludes that a reasonable juror could not find that PSI possessed a fiduciary duty in these circumstances. Although PSI occupied a somewhat dominant position due to its history on the site and relevant expertise, the relationship was not one of undue superiority or influence. Iron Rooster was not even a client of PSI at the time disclosure of these facts would have been timely; it was the counterparty to a sale of the property by PSI's client, KFC. That relationship hardly supports the imposition of fiduciary duties on PSI. And while KFC instructed PSI to treat Iron Rooster as a client, there was no genuine kinship or longstanding relationship between the parties through which genuine influence could arise. And Iron Rooster did not allege that its sole member, Mr. Caldarera, was infirm or inferior by way of age, health, or mental condition. To the contrary, the pictured painted by the complaint is that Mr. Caldarera was a competent counterparty. Indeed, the complaint indicates that Iron Rooster maneuvered to minimize any asymmetry in knowledge rather than "repose[ ] complete trust" in PSI. *Burdett*, 957 F.2d at

1381. For example, instead of relying on PSI's word alone, Iron Rooster included LDEQ on its calls about the site. *See* Sec. Am. Compl. ¶ 31. Further, Iron Rooster took steps to hold PSI accountable for potential misrepresentations: it required PSI to put its assurances in writing and sought KFC's endorsement of those assurances before proceeding with the purchase. *Id.* ¶¶ 32, 39. It is true that Iron Rooster relied on PSI's expertise in executing the sale, but not "every expert is automatically a fiduciary. That is not the law in Illinois or anywhere else." *See Burdett*, 957 F.2d at 1381. Rather, what matters is whether a party took the expert's advice "uncritically and unquestioningly." *Id.* ("He knew that she took his advice uncritically and unquestioningly and that she sought no 'second opinion' or even—until the end, when at last her suspicions were aroused— any documentary confirmation of the investments to which he steered her."). Iron Rooster has not alleged that it afforded PSI this sort of uninspected influence and, as a result, no fiduciary duty arose.

In sum, although much of Iron Rooster's fraud claim does not survive summary judgment, the claim remains viable to the extent that that it is premised on PSI's statement that remediation at the site was virtually complete.[7]

### D.  Contractual Limits on Liability

In addition to fraud, Iron Rooster has pleaded a variety of claims against PSI, including breach of contract, negligent misrepresentation and suppression, and detrimental reliance. PSI seeks judgment circumscribing its potential liability as to any claims on the basis of two contractual limitations clauses and supplies the following facts.

---

[7] The surviving fraud claim is not subject to the limitations clauses discussed below. The Court need not reach the threshold issue—whether fraud claims are categorically exempt from the limitations—because, either way, it does not fall within their terms: PSI's alleged representation relates to the pre-sale state of the property and therefore does not relate to PSI's work under the post-sale agreements.

As part of the purchase agreement, KFC entered an "Assignment, Assumption, and Indemnification Agreement" with Iron Rooster that purported to assign KFC's contract with PSI (the "PSI-KFC contract"). DSOF ¶ 10. After the sale, Iron Rooster authorized PSI to perform work on the property pursuant to three agreements dated March 13, 2014, August 21, 2014, and June 29, 2015 (individually, the "March 2014 post-sale agreement," the "August 2014 post-sale agreement," and the "June 2015 post-sale agreement;" collectively, the "post-sale agreements"). *Id.* ¶ 14.[8] Iron Rooster does not dispute the existence of these contracts, instead it attacks the scope of certain terms within the post-sale agreements.[9] In particular, this dispute centers on a set of "General Conditions" appended to each post-sale agreement, which included a contractual liability limitation and a contractual time limitation. *Id.* ¶¶ 15-17.[10] The liability limitation states:

> "Should PSI or any of its employees be found to have been negligent in the performance of its work, or to have breached any express or implied warranty, representation or contract, client [Iron Rooster] . . . agree[s] that the maximum aggregate amount of the liability of PSI, its officers, employees, and agents shall be limited to $25,000.00 or the total amount of the fee paid to PSI for its work performed on the project, whichever amount is greater."

*Id.* ¶17. As relevant to this provision, the parties agree that Iron Rooster has paid PSI $112,684.90 for services related to the property. *Id.* ¶ 21.

---

[8] Although Iron Rooster states that the paragraph is "[d]isputed as written," *see* Iron Rooster DSOF at 3, the briefing on the motion indicates the parties agree on the dates of the proposals. Indeed, directly after stating that the paragraph is disputed as written, Iron Rooster adds that it "does not dispute that it authorized the specific services in the PSI Proposals." *Id.*

[9] *See* Resp. Br. 3, ECF No. 221 (listing arguments against the applicability of certain clauses of the contract but not referencing the contract's enforceability).

[10] In its response to PSI's statement of facts and its Response Brief, Iron Rooster disputes PSI's statement regarding the inclusion of the limitations in the August 21, 2014 proposal. *See* Iron Rooster DSOF 4, ECF No. 221-3. Iron Rooster does not cite any record evidence to support the denial, so the Court treats PSI's statements as admitted. Even if Iron Rooster had cited to the relevant paragraph of Mr. Caldarera's affidavit stating that the limitations were not included in the August 21, 2014 proposal, the Court would still not credit the denial because it granted PSI's motion to strike that paragraph of the affidavit.

The second limitation, the time limitation, provides that "[n]o action or claim, whether in tort, contract, or otherwise, may be brought against PSI, arising from or related to PSI's work, more than two years after the cessation of PSI's work hereunder, regardless of the date of discovery of such claim." *Id.* ¶ 16. The parties disagree about the extent to which PSI **completed** the work contemplated by the proposals, but the undisputed record is clear about the date that PSI **ceased** fieldwork under the post-sale agreements: the only "field work and analysis" that PSI performed on February 28, 2016 or thereafter related to a final report filed May 16, 2016. *Id.* ¶¶ 18, 19.[11]

### A.  Law of the Case

PSI's threshold argument, however, does not depend on the language of either contractual limitation; instead, PSI contends that, pursuant to Judge Vance's order transferring the case from the Eastern District of Louisiana and the law of the case doctrine, any claim for breach of the PSI-KFC contract is subject to the limitation clauses. "The law-of-the-case doctrine generally provides that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Musacchio v. United States*, 136 S. Ct. 709, 716 (2016) (quoting *Pepper v. United States*, 562 U.S. 476, 506 (2011)). And PSI reads—and extrapolates from—Judge Vance's order correctly: in relevant part, the Order finds that "any allegation that PSI violated the terms of the PSI[-KFC] Contract [is] subject to the forum selection clause" because Iron Rooster conceded as much in its Second Amended Complaint. *See* Order

---

[11] Again, Iron Rooster disputes PSI's statement relating to the cessation of work but does not cite any record evidence to support the denial. On that basis alone, the Court deems the statement admitted. Even if Iron Rooster had cited to the record, the only evidence potentially indicating continuing work is Mr. Caldarera's statement that "earlier [in 2019], PSI stopped performing any work on the Property." Caldarera Affidavit ¶ 20. Read in conjunction with Iron Rooster's second amended complaint—which states that PSI ceased working for Iron Rooster in June 2016—Mr. Caldarera's reference must relate to the final sampling work that PSI undertook for KFC after ceasing contact with Iron Rooster. Sec. Am. Compl. ¶¶ 79, 89-93.

Granting Transfer 22, ECF No. 211-2 ("Iron Rooster's third-party complaint explicitly states that each of the post-sale agreements was an extension, modification, and/or amendment to the PSI Contract."). Because the forum selection clause and the two limitations clauses are contained within General Conditions, Judge Vance's finding regarding the relationship between the PSI-KFC contract and the post-sale agreements applies equally to all three clauses.

PSI's conclusion, however, does not follow inexorably from the above. The law of the case is a "discretionary doctrine," not a binding one: it "does not limit the district court's power to reopen what already has been decided." *United States v. Harris*, 531 F.3d 507, 513 (7th Cir. 2008). The doctrine is "no more than a presumption, one whose strength varies with the circumstances"— and present circumstances indicate only a weak presumption. *Avitia v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219, 1227 (7th Cir. 1995). First, the relevant considerations on this motion differ substantially from those at issue in the motion to transfer before Judge Vance. The question at that juncture was whether all of Iron Rooster's claims should be litigated in the same court; at present, the question is how the contracts fit together for the purpose of assessing ultimate liability. The difference in posture counsels against an unquestioning adherence to Judge Vance's finding.

It is also significant that Judge Vance did not reach her conclusion based on an interpretation of either the PSI-KFC contract or the post-sale agreements. Nor was her ruling based on findings of fact supported by record evidence; instead, Judge Vance found that, due to its prior admission, Iron Rooster could not properly challenge PSI's argument that the post-sale agreements amended the PSI-KFC contract. Crucially, however, PSI does not make that same argument at present. Indeed, PSI's statement of facts provides evidence that the post-sale agreements ***did not*** amend the PSI-KFC contract. PSI's only mention of the PSI-KFC contract in that statement of facts is to state that it was "purporte[ly]" assigned to Iron Rooster at the time of sale. DSOF ¶ 10.

26

PSI's contractual relationship with Iron Rooster, on the other hand, is described in substantial detail and without reference to the PSI-KFC contract. PSI's work was performed "pursuant to the PSI proposals" (referring to the post-sale agreements), the terms of which do not explicitly amend or otherwise reference the PSI-KFC contract. DSOF ¶ 12. In fact, the General Conditions contained in each post-sale agreement state that the relevant agreement is "the entire understanding of the parties, and there are no representations, warranties, or undertakings made other than as set forth herein." *See, e.g.*, March 2014 post-sale agreement 10, ECF No. 211-9. As a result, the available record evidence—submitted by PSI—indicates that the post-sale agreements were independent contracts that did not modify the KFC-PSI contract. Furthermore, PSI's argument that Judge Vance's ruling should be broadly construed as establishing, for all purposes, that the post-sale agreements modified and amended the KFC-PSI contract is inconsistent with its contention that the limitations clauses operate at the level of the individual proposal. *See, e.g.,* Reply Br. 7-8, ECF No. 227.[12]

Given the substantially changed circumstances, the Court declines to stretch Judge Vance's narrow ruling on venue into a broad substantive ruling as to the scope of the post-sale agreements. And based on PSI's submission of facts, this Court concludes that the PSI-KFC contract is distinct from the post-sale agreements and was not amended to include the General Conditions provided in those agreements.

### B. Liability limitation and Time Limitation

---

[12] PSI also appears not to appreciate that applying Judge Vance's ruling broadly could expose it to broader liability. Consider, for example, the impact Judge Vance's finding could have on PSI's arguments regarding the contractual time limitation. Under the amendment scenario, the prohibition on claims brought more than two years after "work hereunder" could plausibly be read to refer to work under the composite contract formed through the addition of the three post-sale agreements to the KFC-PSI contract. Read that way, a finding that work had not ceased under the final post-sale agreement might render claims under all of the component contracts timely.

Under Illinois law, agreed upon limitations to future suits—such as exculpatory clauses and clauses altering the statute of limitations—are enforceable, though read narrowly. *See Harris v. Walker*, 119 Ill. 2d 542, 548, 519 N.E.2d 917, 919 (Ill. 1988) ("[E]xculpatory clauses are not favored and must be strictly construed against the benefitting party, particularly one who drafted the release."); *Midwest Builder Distrib., Inc. v. Lord & Essex, Inc.*, 383 Ill. App. 3d 645, 665, 891 N.E.2d 1, 21 (Ill. App. Ct. 2007) ("[C]ontractual limitations on suit are disfavored by courts, so where there is any ambiguity, they are to be construed strictly against the drafter.").

PSI contends that, by their terms, the limitations extend to all of Iron Rooster's claims. Iron Rooster responds with two arguments as to why various of these claims are not subject to the limitations.[13] Because PSI does not attack the sufficiency of the evidence supporting Iron Rooster's claims, the Court can only assess how the contractual terms interact, as a matter of law, with potentially viable claims. The Court construes the set of potential claims as follows. First, Iron Rooster has alleged breach of three separate categories of contracts: the PSI-KFC contract, PSI's broader commitment to achieve remediation after the sale, and the three post-sale agreements. Sec. Am. Compl. ¶ 101. Second, Iron Rooster has conceivably alleged multiple instances of detrimental reliance: first, reliance stemming from PSI's pre-sale activity, *Id.* ¶¶ 116a-116d; second, detrimental reliance as an alternative theory of recovery under the three categories of contract listed above. Third, Iron Rooster has conceivably alleged various instances of negligent misrepresentation and suppression, which for present purposes fall into two categories: those that occurred before the post-sale agreements and/or concerned only the state of the property prior to the post-sale remediation, *Id.* ¶¶ 30, 43, and those that occurred after sale and concerned the

_____

[13] In the briefing, Iron Rooster also argues that certain claims are excluded because the limitations were not included in the August 21, 2014 proposal. The Court rejects this argument, however, because there is no factual basis for it. *See supra* note 10.

necessity of entering into a post-sale agreement to perform certain work. *Id.* ¶¶ 56, 74. As a result, the Court examines the scope of the limitation clauses with respect to the above set of potential claims.

### 1. Limitations of Contract Claims

First, Iron Rooster argues that the limitations only apply to one portion of its breach of contract claims.[14] Iron Rooster argues that because the limitations reference PSI's "work"— defined in the post-sale proposals as "the specific services to be performed by PSI as set forth in PSI's Proposals," Resp. Br. 5, ECF No. 221 —they extend only to claims that specifically arise from a failure to complete the work described in the proposals. As a result, Iron Rooster argues, only claims for breach of the post-sale agreements are covered; claims for breach of the PSI-KFC contract or PSI's broader commitments, which "are not based solely—or even predominantly—on specific services described in the PSI proposals," *Id.* at 7, remain unencumbered by the limitations. In making this argument, however, Iron Rooster overlooks significant portions of the contractual language. As for the liability limitation, a second portion of the limitation extends the cap to breaches of "***any*** express or implied warranty, representation or contract" (emphasis added). And the time limitation extends to claims not only "arising from" but also "related to" PSI's work under the proposals.

Despite these omissions, Iron Rooster's argument correctly identifies an issue with reading the text of the liability limitation in isolation. Removed from context, the text of the liability

---

[14] Iron Rooster also argues that the liability limitation does not apply to its request for specific performance. Under Illinois law, "the purchaser and seller may effectuate a complete bar to specific performance by including in the contract clear language indicating that the liquidated damages provision is to be the sole remedy in the event of nonperformance." *O'Shield v. Lakeside Bank*, 335 Ill. App. 3d 834, 841, 781 N.E.2d 1114, 1120 (Ill. App. Ct. 2002). Here, the liability limitation does not explicitly state that damages are the sole remedy, only that any damages shall be capped. As a result, the contract does not exclude the equitable remedy of specific performance.

limitation indicates that any breach of contract—even one entirely unrelated to the subject matter of the proposal—would be subject to the cap. That can't be right. Taking the contract "as a whole," *Joyce v. DLA Piper Rudnick Gray Cary LLP*, 382 Ill. App. 3d 632, 637, 888 N.E.2d 657, 662 (Ill. App. Ct. 2008), the liability limit is best read to work in conjunction with the time limit and to apply to the same set of claims: those claims "arising out of or related to" PSI's work under the proposal. Indeed, PSI offers a similar interpretation in its Reply Brief—that the cap applies to breaches "related to PSI's engagement to perform the work related to the proposal," *see* Reply Brief at 2. "Related to" is hardly a self-defining term, but the post-sale agreements—and their relationship to one another—provide further clarification. No single agreement obligates PSI to complete the broader goal of readying the Metairie Road site for re-development; instead, each agreement delineates a specific scope of work at issue. Especially in light of the imperative to "strictly construe[ ]" such clauses "against the benefitting party, particularly one who drafted the release," the limitation clauses must be read to operate in an equally piecemeal fashion. *See Harris*, 119 Ill. 2d at 548. As a result, to be related to PSI's work under a given post-sale agreement, the claim must concern work necessary to complete the specific services Iron Rooster engaged PSI to provide under that agreement.

Under this interpretation, claims for breach of the PSI-KFC contract or of PSI's broader commitments to remediate the property fall outside the limitations. As noted above, the PSI-KFC contract was a separate agreement that imposed distinct obligations on PSI (*e.g.*, to achieve the 2005 VRAP for KFC) and therefore relates to work not described by the post-sale agreements. Similarly, the "broader commitments" made by PSI regarding the post-sale remediation do not fall within the limitation. Although there is some relationship between the two—the specific services provided in the proposals represent steps on the way to fulfilling the broader commitment—the

obligations themselves are distinct. If Iron Rooster brought a claim for breach of the broader commitments, it could not point to breach of a post-sale agreement as a sufficient condition for finding liability: PSI could breach one of the post-sale agreements but satisfy its broader obligation to remediate the property through an alternative route. Similarly, PSI could not point to its breach of a post-sale agreement as a necessary condition for finding a breach of the broader commitment: PSI could satisfy each of the post-sale agreements but, because of their limited scope, fail to prepare the property for redevelopment. As a result, a claim for breach of the broader commitments cannot properly be said to concern the specific work under the post-sale agreements.

### 2. Limitations of Negligence Claims

Second, Iron Rooster argues that its non-contract claims for negligent misrepresentation, negligent suppression, and detrimental reliance are not subject to the limitations. Although grouped with the negligence claims, detrimental reliance sounds in contract, not tort, and must assessed using the framework for breaches of warranty set out above. *See Stringer Const. Co. v. Chicago Hous. Auth.*, 206 Ill. App. 3d 250, 260, 563 N.E.2d 819, 825 (Ill. App. Ct. 1990) ("Under Illinois law, a promissory estoppel claim will succeed where the other elements of a contract exist (offer, acceptance, and mutual assent), but consideration is lacking."). Once again, under both limitations, the question is whether a claim relies on the breach of a promise "related to" PSI's work under the post-sale agreements. The above finding regarding the scope of that language, however, renders the application of the limitations to any detrimental reliance claim an impossibility. As discussed above, a claim is related to a post-sale agreement only if it concerns the specific services Iron Rooster authorized PSI to complete under that agreement. But a claim for a breach of a valid contractual promise is just that, a breach of contract claim, not a detrimental reliance claim. Indeed, a detrimental reliance theory could apply to these promises only if the

31

relevant post-sale agreement is found invalid—and in that case the limitations would, of course, fall too. In short, no detrimental reliance claim could be subject to the limitations because such claims are either outside the scope of the limitations or are conditional on the invalidity of those very limitations.

Negligence claims require a separate analysis, and one bifurcated by clause because the liability limitation reaches less broadly (negligence "in the performance of work") than the time limitation (negligence "related to PSI's work"). The Court takes up the liability limitation first. "An exculpatory agreement must contain clear, explicit, and unequivocal language referencing the type of activity, circumstance, or situation that it encompasses and for which the plaintiff agrees to relieve the defendant from a duty of care." *Evans v. Lima Lima Flight Team, Inc.*, 373 Ill. App. 3d 407, 414-15, 869 N.E.2d 195, 203 (Ill. App. Ct. 2007). To be included, however, a particular injury need not be specifically enumerated, rather "[t]he injury must only fall within the scope of possible dangers ordinarily accompanying the activity and, therefore, reasonably contemplated by the parties." *Id.* Here, the question is whether negligent misrepresentation and suppression fall within the scope of dangers present in the performance of an environmental consultant's work. Because the work of environmental consultants generally—and the work that PSI was obligated to perform specifically—requires the collection and communication of information, this sort of injury was reasonably foreseeable.

The fact that negligent misrepresentation and suppression were reasonably foreseeable does not mean, however, that all negligent misrepresentation or suppression arose in the performance of work. As with the allegations of breach of contract, application of the limitation depends on the timing and subject matter of the allegation. One category of alleged negligent misrepresentation or suppression relates to PSI's statements, or omissions, that occurred well

32

before the post-sale agreements and/or concerned only the state of the property prior to sale. *See* Sec. Am. Compl. ¶¶ 46-48, 123, 130.[15] Any such statements or omissions clearly did not arise in the performance of work and are therefore not covered by the liability limitation. A second category concerns PSI's statements regarding the necessity of entering into the post-sale agreements to perform certain work thereunder. *See* Sec. Am. Compl. ¶¶ 52, 74. Although the statements in this category "relate to" the post-sale agreements—they concern the importance of work that was eventually specified and agreed to be completed in those agreements—they did not "ar[ise] in the performance of work" because they pre-dated that work. Therefore, they similarly fall outside the liability limitation.

Turning to the time limitation, its broader language encompasses the second category of alleged misrepresentation or suppression but not the first. As noted above, the second category of statements "relate to" the post-sale agreements because the misrepresentations concern the obligations eventually set out in those agreements. As a result, these statements are subject to the time limitation. The reach of the time limitation is not so broad, however, as to encompass the first category of allegations. Under the interpretation of "related to" developed above, these allegations, no more relate to PSI's work than did they arise in the performance of that work.

To summarize: as a matter of contractual interpretation, the liability limitation and the time limitation apply to some but not all of Iron Rooster's potential claims. Both limitations extend to any contract claim relating to work necessary to perform the specific services described in the post-sale agreements; they do not, however, apply to PSI's alleged breach of the assigned PSI-KFC contract or PSI's alleged breach of broader commitments to remediate the property. Further,

---

[15] As stated *supra* note 8, even if Iron Rooster's fraud claim could be subject to the limitations, it falls outside the limitations because it is not "related to" PSI's work under the post-sale agreements.

the limitations cannot apply to any detrimental reliance claim raised by Iron Rooster. As for negligent misrepresentation or suppression, the liability limitation does not reach any potential claim and the time limitation applies only to those claims premised on representations or omissions that concerned the necessity of specific work set out in the post-sale agreements but not those that occurred prior to sale or concerned only the pre-sale state of the property.

### 3. Time-barred Claims

The above resolves the effect of the liability limitation—liability on all claims within the scope of the limitation is capped at $112,684.90—but not the time limitation, which requires another step. And that step is not, as PSI implies, a matter of determining, through simple calendar arithmetic, the events that preceded suit by more than two years. Rather, the two-year clock operates at the level of individual agreements: as set out in each post-sale agreement, the question is whether the claim was brought "more than two years after the cessation of PSI's work hereunder."

Therefore, it is necessary to determine whether work ceased under each proposal more than two years prior to filing suit. Answering that question is easy for the June 29, 2015 agreement. PSI has admitted that, as of February 28, 2016, it was still working on a final report regarding the soil sampling contemplated under the proposal. DSOF ¶¶ 18, 19, ECF No. 211. Although PSI resists the conclusion, it has conceded that any claim related to the work under that proposal is timely. In its response to PSI's statement of facts, however, Iron Rooster disputes PSI's description of the final report as relating only to the June 29, 2015 agreement. *See* Iron Rooster DSOF 4, ECF No. 221-3. Although framed as a dispute of fact, this is really a dispute over contract interpretation. To support its denial, Iron Rooster quotes the scope of services from the August 21, 2014 agreement, which provides that PSI shall "meet the VRP requirements for obtaining a Certificate of

Completion under Partial VRP." *Id.* According to Iron Rooster, the final report is related to this scope of services because PSI proposed the off-site sampling in order to gain KFC's cooperation with the 2014 VRAP application. But simply because one thing motivates a person to do another does not mean that the two are related in the relevant sense of shared subject matter. And, in this case, it seems more likely that the motivational relationship implies a ***lack*** of subject matter relationship: PSI recommended off-site sampling as a new strategy to gain KFC's cooperation because it was outside the scope of the previous, unsuccessful VRAP application. The separateness of the undertakings is confirmed by the language of the agreement: the August agreement's scope of services expressly states that the proposal "is <u>not</u> intended to address potential off-site impacts." June 29, 2015 Agreement 2, ECF 211-10. Furthermore, in the previous section titled, "Project Understanding," the agreement states that "[t]he new VRAP should <u>not</u> discuss potential ***offsite*** exposure issues," and that offsite remediation "is not a VRP issue, although it is an issue that the LDEQ may evaluate outside of the VRP." *Id.* As a result, the terms of the August 21, 2014 agreement make clear that future off-site sampling fell outside of its scope of services, even if such work was necessary to move forward with remediation.

Independent of the final report, Iron Rooster argues that PSI had not ceased work under the two earlier proposals by the operative date. In so arguing, Iron Rooster focuses on whether PSI had "completed" the obligations described by the relevant proposal. But cessation of work and completion of work are unambiguously distinct terms in the context of contract and carry distinct, sometimes opposing, meanings. *See Midwest Builder Distrib., Inc.*, 383 Ill. App. at 666 ("Only when a party has entirely fulfilled its contractual duties does it make sense to say that the party's work under the contract is complete. To state the converse, it is quite possible for a party to cease performance while its contractual duties are still incomplete."). In many circumstances, a cessation

35

of work constitutes breach rather than satisfaction of contractual obligations. *See e.g. Student Transit Corp. v. Bd. of Ed. of City of Chicago*, 76 Ill. App. 3d 366, 369, 395 N.E.2d 69, 71 (Ill App. Ct. 1979) ("A definite statement to the second party that the first party either will not or cannot perform the contract will operate as an anticipatory breach."). PSI does not challenge Iron Rooster's framing, but where, as here, the contract is clear, the Court must give effect to that clear language not to later interpretations by the parties. *See Omnitrus Merging Corp. v. Illinois Tool Works, Inc.*, 256 Ill. App. 3d 31, 34, 628 N.E.2d 1165, 1168 (Ill. App. Ct. 1993) ("If a contract is clear and unambiguous, the judge must determine the intention of the parties 'solely from the plain language of the contract' and may not consider extrinsic evidence outside the 'four corners' of the document itself."). Therefore, under the contract, the operative question is when work ceased, not when (or if) it was completed. And the undisputed record indicates that PSI ceased work on the two earlier proposals before February 28, 2016: PSI submitted undisputed evidence that it ceased "field work and analysis" prior to that date. *See* DSOF ¶ 15; *see also supra* note 8.

As a result, claims solely related to PSI's work under the March 13, 2014 and August 21, 2014 agreements are time-barred. Most obviously, this includes breach of contract claims stemming from a failure to complete work specified in those proposals. In addition, potential claims for negligent misrepresentation or suppression that relate to time-barred proposals—such as claims relying on PSI's representation that confirmatory soil sampling was necessary, *see* Sec. Am. Compl, ¶ 52—are time-barred.

* * * * *

In sum, PSI's motion to dismiss is denied, its motion to strike is denied in large part and granted in part, and its partial motion for summary judgment is granted in part and denied in part. Iron Rooster may proceed to trial on its claims of breach of contract, detrimental reliance, negligent

and/or fraudulent misrepresentation, negligent suppression, and indemnification.


Date: July 10, 2020

John J. Tharp, Jr.
United States District Judge